**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GAIL R. STENSON, | ) | CASE NO.  3:10-cv-397 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE ZOUHARY |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, | ) | VECCHIARELLI |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, Gail R. Stenson, challenges the final decision of Defendant, Michael J.

Astrue, Commissioner of Social Security (the "Commissioner"), denying Plaintiff's

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* (The "Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of

the Commissioner.

1

## I.  PROCEDURAL HISTORY

On June 12, 2006, Plaintiff filed her applications for DIB and SSI.  Both applications alleged a disability onset date of May 9, 2006.  Plaintiff's applications were denied initially on November 22, 2006, and upon reconsideration on March 1, 2007. Thereafter, on April 5, 2007, Plaintiff requested a hearing before an administrative law judge ("ALJ").

On March 6, 2009, an ALJ held Plaintiff's hearing.  Plaintiff was represented by counsel at the hearing.  Plaintiff, a vocational expert ("VE"), and a medical expert ("ME") testified at the hearing.  On June 3, 2009, the ALJ found Plaintiff not disabled.  On January 29, 2010, the Appeals Council declined to review the ALJ's Decision; therefore, the ALJ's Decision became the final decision of the Commissioner.  On February 23, 2010, Plaintiff timely filed this action in federal court.

Plaintiff asserts three assignments of error:  (1) the ALJ failed to fully and fairly develop the record because he did not refer Plaintiff to a consultative examiner to re-assess Plaintiff's IQ in light of the fact that the ME testified that the evidence of Plaintiff's IQ and alleged depression was ambiguous and unreliable;[1] (2) the ALJ's assessment of Plaintiff's residual functional capacity ("RFC") is not supported by substantial evidence because it failed to include re-assessed IQ scores by a second consultative examiner;

---

[1] The heading for this argument in Plaintiff's Brief is as follows:  "The ALJ failed to fully develop Plaintiff's mental residual functional capacity by ordering a consultative examination."  (Pl.'s Br. 1.)  This heading conflates two distinct issues:  whether the ALJ fully and fairly developed the record, and whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.  The substance of Plaintiff's argument, however, discusses both issues separately. Therefore, the Court will address both issues.

and (3) the ALJ failed to abide by the Social Security Administration's regulations by failing to adequately explain the weight he gave to Plaintiff's medical sources' opinions.[2]

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on February 4, 1957, and was fifty-two years old at the time of the ALJ's Decision.  (Tr. 21, 158.)  Plaintiff graduated from high school, completed one year of college, and obtained a nursing assistant license.  (Tr. 26-27, 156.)  Plaintiff's past relevant work was as a nursing assistant.  (Tr. 57-58.)  She left her last position as a nursing assistant in 2005 to return to school.  (Tr. 152, 362.)

At the time of her hearing, Plaintiff was enrolled in customer service courses as part of a rehabilitation program to help her recover from the ruptured aneurysm she suffered in May 2006 that is the basis of her claim for disability.  (Tr. 27-28.)

### B.    Medical Evidence

On May 17, 2006, Plaintiff presented to St. Vincent Mercy Medical Center with a complaint of a four-day headache, left-side facial droop, and dysarthria (i.e., distorted speech).  (Tr. 249.)  Testing indicated that she suffered hemorrhaging in her brain caused by a ruptured right middle cerebral artery (i.e., she suffered a ruptured aneurysm).  (Tr. 249.)

---

[2] The heading for this argument in Plaintiff's Brief is as follows:  "The ALJ's residual functional capacity finding is not based upon substantial evidence."  (Pl.'s Br. 9.)  The substance of Plaintiff's argument, however, regards whether the ALJ abided by the Social Security Administration's regulations when evaluating Plaintiff's medical sources' opinions.  Therefore, the Court will address this argument as a matter of whether the ALJ abided by the Social Security Administration's regulations.

On May 26, 2006, Dr. Scott T. Dull, M.D., performed an aneurysm clipping.  (Tr. 249.)  Plaintiff was then transferred to Coghlin Rehabilitation Center at Medical University of Ohio for rehabilitation on June 1, 2006.  (Tr. 249.)  On June 9, 2006, Plaintiff was discharged from Coghlin Rehabilitation.  (Tr. 249.)  Although Plaintiff was scheduled to receive outpatient rehabilitation, Plaintiff was unable to appear for her appointments because she allegedly had difficulty receiving transportation from the Toledo Area Regional Paratransit Service.  (Tr. 249.)

On June 23, 2006, Plaintiff underwent a neuropsychological evaluation performed by Dr. Mary Haines, PhD., ABPP, a Board Certified Clinical Neuropsychologist.  (Tr. 249-54.)  Dr. Haines assessed Plaintiff with a Verbal IQ score of 86, a Performance IQ score of 79, and a Full Scale IQ score of 81, which indicated functioning within the low average range.  (Tr. 251.)  However, Dr. Haines found that Plaintiff demonstrated relatively intact attention and working memory, right-hand grip strength, processing speed, aspects of visuoperception, oral vocabulary, general fund of information, verbal memory, facial recognition, and reasoning skills.  (Tr. 252.)  Dr. Haines reported that Plaintiff exhibited relative deficits in right-hand dexterity, left-hand motor skills, block construction, aspects of language such as visual naming and letter fluency, memory for social scenes, and aspects of executive functioning such as mental flexibility and motor persistence.  (Tr. 252.)  In sum, Dr. Haines found that Plaintiff's physical and mental functioning were consistent with the consequences of a ruptured aneurysm.  (Tr. 252-53.)

In light of Plaintiff's presentation and reported condition, Dr. Haines further found that Plaintiff showed symptoms consistent with mild to moderate depression, likely

4

caused by a combination of difficulty adjusting to the effects of her ruptured aneurysm and the direct affects of the ruptured aneurysm on her brain.  (Tr. 253.)

Although Plaintiff reported to Dr. Haines that she could perform all activities of daily living except manage her finances, Dr. Haines noticed that Plaintiff's presentation appeared relatively worse between her evaluation and when she was receiving inpatient therapy at the hospital several weeks prior.  (Tr. 253.)  Dr. Haines attributed this apparent decline to Plaintiff's inactivity at home relative to the therapy she was receiving at the hospital.  (Tr. 253.)

Dr. Haines recommended that Plaintiff consider taking antidepressants; participate in a brain injury support group; and increase her mental and physical activity to improve her cognitive, physical, and emotional functioning.  (Tr. 253.)  Dr. Haines believed that Plaintiff's fatigue would prevent Plaintiff from returning to school in August of 2006, but reiterated that Plaintiff should participate more often in outpatient therapy to improve her condition.  (Tr. 253.)

On June 28, 2006, Dr. John Mareska, M.D., performed a neurological examination on referral from Dr. Christopher Lynn, M.D.,[3] to assess Plaintiff's facial droop.  (Tr. 211.)  Dr. Mareska found that Plaintiff was in no acute distress; had good finger-to-nose motor skills; and had generalized, slow but precise speech.  (Tr. 212.)  Dr. Mareska noted that Plaintiff denied any focal weakness or numbness.  (Tr. 211.)  Dr. Mareska recommended that Plaintiff continue with her rehabilitation.  (Tr. 212.)

_____

[3] It is not clear in the record who Dr. Christopher Lynn, M.D., is, what his treatment relationship with Plaintiff was, or what his medical opinions of Plaintiff were.

5

On August 9, 2006, Plaintiff presented to Dr. Dull for a follow-up examination of her recovery from her brain surgery.  (Tr. 351.)  Dr. Dull found that Plaintiff "continues to do well with resolution of her subarachnoid hemorrhage and accompanying symptoms," and that Plaintiff had "a normal neurological examination."  (Tr. 351.)

In October 2006, Ms. Tammy Cremeans, MS CCC-SLP, a Speech Language Pathologist, saw Plaintiff on referral for outpatient speech therapy.  (Tr. 352.)  Ms. Cremeans reported that Plaintiff presented with moderate to severe deficits in short term recall, attention and concentration, and problem solving skills.  (Tr. 352.)  Ms. Cremeans reported that Plaintiff was unable to attend to structured tasks for more than five minutes; performed poorly on tasks involving two-step directions given both orally and in writing; was unable to drive to both novel and familiar destinations without becoming lost; and was unable to successfully attend to her finances.  (Tr. 352.)  Ms. Cremeans concluded that Plaintiff's "current deficits limit further educational opportunities"; that "Employment is limited due to her current deficits"; and that Prognosis for full recovery to premorbid functioning level is poor."  (Tr. 352.)

October 18, 2006, Ms. Marsha G. Teeste, M.Ed., M.S.W., P.C.C., performed an Adult Diagnostic Assessment of Plaintiff at Unison Behavioral Healthcare upon referral from Ms. Cremeans.  (Tr. 353-60.)  Ms. Teeste diagnosed Plaintiff with adjustment disorder with depressed mood related to Plaintiff's medical condition, and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 50.[4]

---

[4]  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of*

On October 24, 2006, Dr. Christopher Layne, Ph.D., A.B.P.P., evaluated Plaintiff at the request of the Bureau of Disability Determination.  (Tr. 361-65.)  Dr. Layne assessed Plaintiff with a Verbal IQ score of 70, a Performance IQ score of 72, and a Full Scale IQ score of 68, which indicated functioning within the mildly retarded range. (Tr. 364.)  Dr. Layne considered Plaintiff's cognitive test scores slightly low estimates, however, because Plaintiff's history did not suggest such mental deficits; because Plaintiff's behavior suggested Plaintiff did not suffer such deficits; and because Plaintiff was slightly unmotivated during Dr. Layne's testing.  (Tr. 364.)

Dr. Layne assigned Plaintiff a GAF score of 75.[5]  Dr. Layne concluded that Plaintiff was not impaired in her ability to relate to co-workers; to attend to and persist at simple, repetitive tasks; and to withstand work stress.  (Tr. 365.)  He concluded that Plaintiff was mildly impaired in her ability to understand and follow instructions.  (Tr. 365.)  Furthermore, Dr. Layne concluded that Plaintiff was moderately impaired in her ability to manage money.  (Tr. 365.)

On November 16, 2006, state agency consultative psychologist Dr. Todd Finnerty, Psy.D, performed a Mental Residual Functional Capacity Assessment of Plaintiff.  (Tr. 368-70.)  Dr. Finnerty reported that Plaintiff continued to complain that she had difficulty with her memory, thinking, and walking.  (Tr. 370.)  However, Dr. Finnerty noted that Plaintiff's complaints appeared to be exaggerated and not credit-worthy

---

*Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[5] A GAF score between 71-80 indicates no more than slight impairment in social, occupational, or school functioning .  If symptoms are present, they are transient and expect able reactions to psycho-social stressors.  *See Diagnostic and Statistical Manual of Mental Disorders* 34.

because of misinformation that she provided to Dr. Finnerty and Plaintiff's health care providers regarding Plaintiff's substance abuse, and because they were inconsistent with Plaintiff's medical evidence.  (Tr. 370.)  Dr. Finnerty concluded that Plaintiff was minimally impaired in understanding and following instructions; was moderately impaired in managing money "simply because she does not have the motivation or proper judgment to use money wisely"; and was not impaired in relating to co-workers, performing simple, repetitive tasks, or withstanding work stress.  (Tr. 370.)

Also on November 16, 2006,  Dr. Todd Finnerty performed a Psychiatric Review of Plaintiff.  (Tr. 372-85.)  Dr. Finnerty determined that Plaintiff suffered no limitations in her abilities to maintain social functioning, mild limitations in her ability to perform daily activities, moderate limitations in her ability to maintain concentration, persistence, and pace; and that Plaintiff had no episodes of decompensation.  (Tr. 382.)

On December 5, 2006, Plaintiff presented to the emergency room at St. Vincent Mercy Medical Center complaining of chest pain and "left upper extremity numbness and dexterity issues."  (Tr. 387, 389.)  Dr. Mareska was the attending neurologist and reported that no facial droop was noted during Plaintiff's visit; that Plaintiff's speech was slow but precise; that Plaintiff had decreased dexterity in her left upper extremity, with mild fasciculation of the left upper extremity; that Plaintiff had poor finger-to-nose dexterity as it related to her upper left extremity; and that Plaintiff had decreased sensation in her left hand on the radial, medial, and ulnar distributions.  (Tr. 390-91.)  Plaintiff underwent a CT scan (Tr. 395), and chest x-ray (Tr. 396).  Dr. Mareska indicated that there were no acute CT scan findings (Tr. 391), and the chest x-ray indicated no acute chest abnormalities (Tr. 396).

8

On February 25, 2007, state agency consultative physician Dr. Esberdado Villanueva, M.D., performed a Physical Residual Functional Capacity Assessment of Plaintiff.  (Tr. 397-404.)  Dr. Villanueva indicated that Plaintiff's medical records lacked statements from any source regarding Plaintiff's physical capacities.  (Tr. 403.)  Dr. Villanueva concluded, based on all of Plaintiff's medical evidence, that Plaintiff suffered no exertional, postural, manipulative, visual, or communicative limitations.  (Tr. 398-401.)  As to environmental limitations, Dr. Villanueva concluded that Plaintiff should avoid hazards such as machinery and heights.  (Tr. 401.)

Between April 17, 2007, and February 5, 2008, Plaintiff presented to Dr. Satwant Gill, M.D., at Unison Behavioral Healthcare for psychological treatment upon referral.[6] (Tr. 405-422.)  Dr. Gill indicated in his Initial Psychiatric Evaluation that Plaintiff's mental condition was more likely indicative of a psychotic disorder than a mood disorder; noted that Plaintiff had a history of polysubstance dependence (although Plaintiff reported that it was in remission); indicated that stressors were severe; and assigned Plaintiff a GAF score of 50.[7]  (Tr. 420-22.)  On the five subsequent occasions that Plaintiff presented to Dr. Gill, however, Plaintiff reported that she was doing well; denied current depression; indicated that her depression medication, Abilify, controlled her depression well; and indicated that she did not suffer side effects from the Abilify.  (Tr. 405, 407, 409, 411,

---

[6] It is not clear in the record by whom Plaintiff was referred to Dr. Gill for evaluation and treatment.

[7] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34.

414.) Dr. Gill indicated that Plaintiff suffered seizures, but that the seizures were controlled; that Plaintiff's mood was stable; and that Plaintiff did not appear to be in any acute distress. (Tr. 405, 407, 409, 411, 414.)

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified to the following. Plaintiff used to work as a nursing assistant before she suffered her ruptured aneurysm and consequent surgery. (Tr. 29-30.) She left her employment with her last nursing home to return to school, however. (Tr. 30-31.) She used to abuse drugs and alcohol, but had not abused drugs or alcohol since 2006. (Tr. 32.) Plaintiff lived by herself, and had done so for approximately three years. (Tr. 32, 33-34.) She was divorced, had two adult children, and had three biological grandchildren and eight step-grandchildren. (Tr. 33.) She saw her grandchildren often. (Tr. 33.)

Plaintiff had a driver's license and drove her car three to four times a week to go grocery shopping, visit her grandchildren, and go to the Laundromat. (Tr. 34, 36, 40.) She cleaned her house by herself, including doing the dishes and laundry (Tr. 36, 40); and she prepared her own meals and paid her own bills (Tr. 36, 40).

Plaintiff was unable to work because she did not like to be out in public and did not want to leave her house. (Tr. 37.) She obtained therapy for her mental condition at Unison Behavioral Healthcare. (Tr. 37.) She also took medication, but her medication did not cause her problems. (Tr. 37.) Furthermore, Plaintiff was engaged in customer service courses as part of rehabilitation for her ruptured aneurysm to prepare her for obtaining a job in the future. (Tr. 57.)

10

## 2.    Medical Expert's Testimony

The ME testified at Plaintiff's hearing that he "thought that some of the mental health indications stuff, especially with respect to depression, were both ambiguous and unreliable."  (Tr. 45.)  In response to Plaintiff's counsel's questioning, the ME agreed that the record was ambiguous and insufficient to determine the validity of Plaintiff's IQ scores as assessed by consultative examiner Dr. Layne.[8]  (Tr. 48.)  However, the ME testified that there was enough evidence in Plaintiff's records to make a judgment of Plaintiff's medical status.  (Tr. 39, 41.)  The ME noted that Plaintiff's testimony of her daily activities indicated a higher level of intellectual functioning than that indicated by Dr. Layne's IQ scores.  (Tr. 50-51.)

The ME found that, at most, Plaintiff would "have problems dealing with the public in a sort of unimpaired way with the broad, general public, and she would have problems with situations that require higher levels of intellectual applications or sustained concentration."  (Tr. 47.)  The ME further found that Plaintiff would be able to maintain concentration, persistence, and pace for two-hour increments over an eight-hour workday for forty hours a week if the work setting required only simple application or executive intellectual functioning.  (Tr. 47.)  The ME believed that Plaintiff would be capable of performing simple two- to three-step tasks.  (Tr. 48.)  The ME also suggested

---

[8] On October 24, 2006, Dr. Layne assessed Plaintiff with a Verbal IQ score of 70, a Performance IQ score of 72, and a Full Scale IQ score of 68, which indicated functioning within the mildly retarded range.  (Tr. 364.)  On June 23, 2006, however, Dr. Haines assessed Plaintiff with a Verbal IQ score of 86, a Performance IQ score of 79, and a Full Scale IQ score of 81, which indicated functioning within the low average range.  (Tr. 251.)  The ME noted the sixteen-point difference between Plaintiff's two Verbal IQ scores at Plaintiff's hearing.  (Tr. 42.)

that Plaintiff would be capable of performing at least four- or five-step tasks because she was able to drive a car.  (Tr. 48.)

### 3.    Vocational Expert Testimony

The VE testified that Plaintiff's participation in vocational courses as part of her rehabilitation appeared inconsistent with her presentation and Dr. Layne's IQ assessment.  (Tr. 56-57.)

The ALJ proposed the following hypothetical person to the VE:

> Assume, if you will, that the hypothetical person is of the same age, education, and work background, [with the] following limitations.  This person would never be able to climb ropes, ladders, and scaffolds.  This person would have to avoid all exposure to unprotected heights and moving and dangerous machinery.  This person would be able to understand and carry out simple instructions, being defined as three or four-step instructions, and wouldn't be able to maintain concentration, persistence, and pace for the performance of simple, routine tasks, as defined, for two-hour increments over an eight-hour workday, 40 hours a week.  This person would be able to relate to co-workers, supervisors, and the public in a superficial manner, and would be able to maintain superficial interpersonal interactions with co-workers and supervisors in a work environment.  This person would be able to deal only with minor changes in the workplace.

(Tr. 58.)

The VE testified that such a hypothetical person would not be able to perform any of Plaintiff's past relevant work.  (Tr. 58.)  The VE testified that such a hypothetical person would, however, be able to perform work as a light, unskilled cleaner/housekeeper (12,800 positions in Ohio, 507,000 positions nationally); as a light, unskilled food assembler (3,600 positions in Ohio, 371,000 positions nationally); and as a light, unskilled small products assembler (20,400 positions in Ohio, 931,000 positions nationally).  (Tr. 59-60.)

The VE testified that his testimony was consistent with the Dictionary of

12

Occupational Titles and with the Selected Characteristics of Occupations.  (Tr. 57.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2.    The claimant has not engaged in substantial gainful activity since May 9, 2006, the alleged onset date.

3.    The claimant has the following severe impairments: cardiovascular accident [i.e., ruptured aneurysm] with status post surgical clipping and cognitive disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ropes, ladders, and scaffolds; perform simple routine tasks; avoid actual exposure to unprotected heights; avoid actual exposure to moving/dangerous machinery; maintain concentration, persistence, and pace in the performance of simple routine tasks, being defined as 3 to 4 step tasks, for 2 hour increments over an 8-hour work-day; have appropriate superficial interactions with the public; perform simple 3-4 step tasks; and is able to deal with minor changes in the work place.

6.    The claimant is unable to perform any past relevant work.

. . . . .

14

9.      The vocational expert testified that the claimant does not have any
        transferrable skills from her past relevant work.

10.     Considering the claimant's age, education, work experience, and
        residual functional capacity, there are jobs that exist in significant
        numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social
        Security Act, from May 9, 2006 through the date of this decision.

(Tr. 12-21.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of*

*Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any

evidence in the record to determine if the ALJ's decision is supported by substantial

evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the

court does not review the evidence *de novo*, make credibility determinations, nor weigh

the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

1989).

The Commissioner's conclusions must be affirmed absent a determination that

the ALJ failed to apply the correct legal standards or made findings of fact unsupported

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as

15

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

> **B.      Whether the ALJ Fully and Fairly Developed the Record**

Plaintiff argues that the ALJ failed to fully and fairly develop the record because the ALJ denied Plaintiff's request for a second consultative examination even though the ME testified that the evidence of Plaintiff's depression and IQ was ambiguous and unreliable.  For the following reasons, the Court finds that this assignment of error without merit.

The ME testified at Plaintiff's hearing that he "thought that some of the mental health indications stuff, especially with respect to depression, were both ambiguous and unreliable." (Tr. 45.)  In response to Plaintiff's counsel's questioning, the ME agreed that there was ambiguity and insufficiency in the record that cast doubt on the validity of Plaintiff's IQ scores as assessed by consultative examiner Dr. Layne.[9]  (Tr. 48.)  The ME also testified that there was sufficient evidence in the medical records to make a judgment about Plaintiff's medical status.  (Tr. 39, 41.)  The ALJ explained that he denied Plaintiff's request for another consultative examination because Plaintiff's testimony, the rest of the ME's testimony, the medical record as a whole, and the fact

---

[9] On June 23, 2006, Dr. Haines assessed Plaintiff with a Verbal IQ score of 86, a Performance IQ score of 79, and a Full Scale IQ score of 81, which indicated functioning within the low average range.  (Tr. 251.)  Four months later, on October 24, 2006, Dr. Layne assessed Plaintiff with a Verbal IQ score of 70, a Performance IQ score of 72, and a Full Scale IQ score of 68, which indicated functioning within the mildly retarded range.  (Tr. 364.)  The ME noted the sixteen-point difference between Plaintiff's two Verbal IQ scores at Plaintiff's hearing.  (Tr. 42.)

that a consultative examination had already been administered indicated that a second consultative examination was not warranted.  (Tr. 9.)

An ALJ has a duty to ensure that a reasonable record has been developed to provide a claimant with a full and fair hearing.  *See Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986).  The claimant, however, has the ultimate burden of providing a complete record, which is defined as evidence complete and detailed enough to enable the Commissioner to make a disability determination. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); 20 C.F.R. 404.1512(c).  An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary.  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); 20 C.F.R. §§ 404.1517, 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests.") (emphasis added).

An ALJ is not required to refer a claimant for a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to make his decision.  *Landsaw*, 803 F.2d at 214; *see* 20 C.F.R. § 404.1519a(b).  A consultative examination normally will be required under certain circumstances that include when a conflict, inconsistency, ambiguity, or insufficiency in the evidence must be resolved, and the ALJ is not able to do so by re-contacting the claimant's medical source.  20 C.F.R. § 404.1519a(b)(4).

Plaintiff's argument that the ALJ failed to fully and fairly develop the record relies solely on the fact that the ME testified that Plaintiff's IQ scores as assessed by Dr.

17

Layne, and information about Plaintiff's depression, were ambiguous and unreliable. Plaintiff does not, however, explain how a re-assessment of her IQ was necessary for the ALJ to make a determination or how the medical record as a whole was insufficient to enable the ALJ to make a determination.  An ALJ's decision must be based on the record as a whole, s*ee* 20 C.F.R. § 416.945(a); S.S.R. 96-8p, 1996 WL 374184, at *5, and the ME's testimony that evidence of Plaintiff's IQ scores and depression from Dr. Layne was ambiguous and unreliable does not lead to the conclusion that the record evidence, as a whole, did not support the ALJ's Decision.

Furthermore, the ALJ reconciled Dr. Layne's IQ assessment with the rest of Dr. Layne's opinion by noting that Dr. Layne considered Plaintiff's cognitive test scores slightly low estimates because:  Plaintiff's history did not suggest such mental deficits; Plaintiff's behavior suggested Plaintiff did not suffer such deficits; and Plaintiff was slightly unmotivated during Dr. Layne's testing.  (Tr. 18.)  The ALJ also noted that Dr. Layne assigned Plaintiff a GAF score of 75, which indicates no more than slight impairment in social, occupational, or school functioning; that Dr. Layne determined that Plaintiff had no impairment with attending to, persisting at, and performing simple, repetitive tasks; and that Dr. Layne determined that Plaintiff had no impairment in being able to withstand work stress.  (Tr. 18.)  The ALJ gave Dr. Layne's opinions weight because they were more consistent with the record as a whole.  (Tr. 17.)

The also ALJ relied on Plaintiff's testimony of her daily activities as a basis for his determination.  The ALJ noted that Plaintiff testified she lived alone, had a driver's license, drove her car three to four times a week, visited her grandchildren, went to the grocery store to do her own grocery shopping, drove to the laundromat to do her own

18

laundry, paid her own bills, and worked one hour a day for three days a week.[10]  (Tr. 9, 16.)

Furthermore, the ALJ relied on the rest of the ME's testimony to make his determination.  (Tr. 9, 19.)  The ME indicated that Plaintiff's first IQ test results, assessed by Dr. Haines one month after Plaintiff suffered her ruptured aneurysm, suggested that Plaintiff had a much higher IQ (Tr. 9); indicated that Plaintiff had only a mild impairment in social functioning and in concentration, persistence, and pace (Tr. 19); and indicated that there was no evidence of episodes fo decompensation (Tr. 19).

In light of the evidence upon which the ALJ relied to make his determination, and absent an explanation from Plaintiff regarding how a second consultative examination for re-assessed IQ scores was necessary for the ALJ to make his determination, the Court finds that the ALJ did not abuse his discretion by denying Plaintiff's request for a second consultative examination and, therefore, did not fail to fairly and fully develop the record.

### C. Whether the ALJ's Assessment of Plaintiff's RFC is Supported by Substantial Evidence

Plaintiff argues that the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence because the assessment did not include re-assessed IQ scores by a second consultative examiner.  Plaintiff asserts this argument in one sentence in her Brief and does not explain how the evidence upon which the ALJ *did* rely does not

---

[10]  It appears the ALJ was referencing to Plaintiff's vocational training in customer service as part of her rehabilitation, as the record does not indicate that Plaintiff was employed, but does indicate that she was engaged in such vocational training.  (*See* Tr. 27-28.)

19

constitute substantial evidence.  (*See* Pl.'s Br. 9.)  Therefore, this assignment of error

lacks merit.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues

adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived.  It is not sufficient for a party to mention a possible

argument in the most skeletal way, leaving the court to put flesh on its bones."); *Meridia*

*Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (citing

*McPherson*).[11]

> **D.**  **Whether the ALJ Abided by the Social Security Administration's**
> **Regulations**

Plaintiff offers a number of arguments under a main contention that the ALJ failed

to abide by the Social Security Administration's regulations by failing to explain the

weight he gave to Plaintiff's medical sources' opinions pursuant to 20 C.F.R. §

404.1527(d).  Specifically, Plaintiff contends that the ALJ's Decision is "completely

devoid" of the analysis required by the Social Security Administration's regulations; that

the ALJ's explanation for rejecting Ms. Cremeans's opinions was inadequate; and that

the ALJ failed to give "good reasons" for rejecting the opinions of Ms. Teeste and Drs.

Haines, Dull, Gill, and Mareska.

---

[11]  Plaintiff also asserts in one line that "The ALJ did not mention or analyze
Listing 12.02(C)."  (Pl.'s Br. 8.)  Not only does plaintiff fail to explain how this
relates to her arguments, but this allegation is contradicted by ALJ's Decision,
wherein the ALJ in fact mentioned and explained Listing 12.02(C):  "The
claimant's mental impairment does not meet or medically equal the criteria of
listing 12.02 . . . .  The undersigned has also considered whether the
'paragraph C' criteria are satisfied.  In this case, the evidence fails to establish
the presence of the 'paragraph C' criteria."  (Tr. 12, 13.)  Therefore, to the
extent that Plaintiff offers this allegation as an argument, it, too, lacks merit.
*See McPherson*, 125 F.3d at 995-96; *Meridia Prods.*, 447 F.3d at 868.

Plaintiff's assertion that the ALJ's Decision is devoid of an analysis of Plaintiff's medical-source opinion evidence lacks merit because it is contradicted by the ALJ's Decision—the ALJ directly addressed the medical source evidence of Dr. Mareska (Tr. 14),[12] Dr. Haines (Tr. 15-16), and Dr. Layne (Tr. 17-18).

Although the ALJ did not discuss some of the other medical evidence of record, such as the findings of the state agency examining and reviewing psychologist and physician, this was not necessarily prejudicial error:  although it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006).  More significantly, Plaintiff has not explained how a failure to discuss such medical evidence prejudiced her or affected the ALJ's disability determination; therefore, the Court need not entertain such an argument.  *See McPherson*, 125 F.3d at 995-96; *Meridia Prods.*, 447 F.3d at 868.

Furthermore, for the reasons set forth below, the Court finds that Plaintiff's assignments of error as they relate to Ms. Cremeans, Ms. Teeste, and Dr. Haines lack merit because these medical sources are not "treating sources" in the context of this case.

An ALJ must give "good reasons" for the weight he gives to a claimant's treating sources' opinions.  20 C.F.R. §§ 404.1527(d)(2) *and* 416.927(d)(2); S.S.R. 96-2p, 1996

---

[12]  The ALJ did not mention Dr. Mareska by name in his Decision, but the medical evidence that the ALJ discussed on page 14 of the Transcript, Exhibits 3F and 13F, consisted of evaluations performed by Dr. Mareska.

WL 374188, at *5; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Only an "acceptable medical source" is considered a "treating source."  S.S.R. 06-03p, at *2.  Ms. Cremeans and Ms. Teeste are not treating sources because they are not "acceptable medical sources" in the context of this case.  S.S.R. 06-03p, 2006 WL 2329939, at *2.

Ms. Cremeans is a Speech Language Pathologist.  Speech Language Pathologists may be considered "acceptable medical sources" for the purposes of establishing speech or language impairments only.  S.S.R. 06-03p, at *1.  Here, Ms. Cremeans opined as to Plaintiff's cognitive abilities:  that Plaintiff was limited by short-term recall, by difficulties in maintaining attention and concentration, and by deficits in problem-solving skills.  Because Ms. Cremeans's opinions were not related to whether Plaintiff was limited by speech or language impairments, she does not qualify as a treating source here.  *See id.*

Ms. Teeste appears to have a Masters of Education, a Masters of Social Work, and a license as a Professional Clinical Counselor.  (*See* Tr. 360.)  None of these credentials qualify Ms. Teeste as a treating source.  *See* S.S.R. 06-03p, at *1.

Furthermore, Dr. Haines's treatment relationship with Plaintiff, as evidenced in the record, indicates that Dr. Haines is not a treating source.  A "treating source" is defined as a "physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  An "ongoing treatment relationship" is "an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source

with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."  *Id.*

Dr. Haines is a Medical Doctor, but the record indicates that she performed a neuropsychological evaluation of Plaintiff only one time, on June 23, 2006.  This one-time evaluation is not a sufficient "ongoing treatment relationship" to qualify Dr. Haines as a treating source.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 506-507 (6th Cir. 2006) (noting that "a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship," and that, "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship").

Because Ms. Cremeans, Ms. Teeste, and Dr. Haines do not qualify as "treating sources," the ALJ was not required to give "good reasons" for the weight he gave their opinions.  Therefore, Plaintiff's contentions that the ALJ erred by giving an insufficient "good reason" for the weight he gave to Ms. Cremeans's opinions, and that the ALJ erred by failing to give "good reasons" for the weight he gave to Ms. Teeste's and Dr. Haines's opinions, lack merit.[13]

Finally, Plaintiff's argument that the ALJ failed to sufficiently explain why he rejected the opinions of Drs. Dull, Gill, and Mareska lacks merit because it does not appear that the ALJ rejected their opinions, and because Plaintiff has utterly failed to

---

[13]  The ALJ did give a reason for not giving Ms. Cremeans's opinions more weight.  The ALJ explained that Ms. Cremeans's opinions were inconsistent with Plaintiff's "daily functioning."  (Tr. 17.)  Plaintiff provides no explanation and cites no legal authority in support of her contention that this reason did not constitute a "good reason."

23

explain how a more thorough discussion in the ALJ's Decision would lead to a different determination.

Drs. Dull, Gill, and Mareska appear to be treating sources because the record indicates that they saw Plaintiff on multiple occasions in relation to her impairments.  Dr. Dull performed Plaintiff's aneurysm clipping surgery and evaluated Plaintiff on follow-up. Dr. Gill saw Plaintiff at least six times at Unison Behavioral Healthcare for treatment of her mental condition.  Dr. Mareska saw Plaintiff twice–once to perform a neurological evaluation at the request of another physician, and again when Plaintiff presented to the St. Vincent Mercy Medical Center Emergency Room with complaints of chest pain, numbness in her upper left extremity, and dexterity issues.

Courts have recognized that "It is an elemental principle of administrative law that agencies are bound to follow their own regulations.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004); *see also* 5 U.S.C. § 706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law."); *Mortonv. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").  Generally, however, courts review the decisions of administrative agencies for harmless error.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality").  Accordingly, if an agency has failed to adhere to its own procedures, courts will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or

24

deprived of substantial rights because of the agency's procedural lapses." *Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see also Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (holding that agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party). The procedural requirements of 20 C.F.R. § 1527(d)(2) provide a substantial right to Social Security disability claimants. *Wilson*, 378 F.3d at 547.

Drs. Dull, Gill, and Mareska all indicated that Plaintiff was recovering from her ruptured aneurysm relatively well; that Plaintiff was in no acute distress; and that Plaintiff's medications were controlling her depression without adverse side-effects. Plaintiff points to nothing in the doctors' opinions that supports a finding of disability. Therefore, Plaintiff has not been prejudiced on the merits of her case and, although the ALJ may have failed to abide by the precise requirements of the Social Security Administration's regulations, such a failure was harmless error. *See Wilson*, 378 F.3d at 547 ("There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant.")

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of

the Commissioner.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: February 1, 2011


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**