IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Gail R. Stenson,                                          Case No. 3:10 CV 397

                              Plaintiff,            MEMORANDUM OPINION
                                                    AND ORDER
                 -vs-
                                                    JUDGE JACK ZOUHARY
Commissioner of Social Security,

                              Defendant.


                              **INTRODUCTION**

       Plaintiff Gail Stenson ("Stenson") timely filed a Complaint (Doc. No. 1) against the

Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny

Plaintiff's applications for a Period of Disability ("POD"), disability insurance benefits ("DIB"), and

supplemental social security income ("SSI") benefits.  This Court has jurisdiction under 42 U.S.C.

§ 405(g).

       This case was referred to Magistrate Vecchiarelli for a Report and Recommendation ("R&R")

pursuant to Local Rule 72.2(b)(2).  Following Plaintiff's Brief on the Merits (Doc. No. 13) and

Defendant's Brief on the Merits (Doc. No. 18), the Magistrate recommended that the Court affirm the

final decision of the Commissioner (Doc. No. 19).

       This matter is now before the Court on Plaintiff's Objections to the R&R (Doc. No. 22).

Pursuant to *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. § 636(b)(1)(B) & (C),

this Court has made a *de novo* determination of the Magistrate's findings.  For the reasons below, the

Court adopts the recommendation to affirm the Commissioner's final decision.

## BACKGROUND

The R&R accurately recites the relevant factual, procedural, and evidentiary background from the record, and this Court adopts them in their entirety (Doc. No. 19 at 2–13). Briefly, Plaintiff is now fifty-four years old, completed one year of college, and obtained a nursing assistant license (Doc. No. 19, at 3). Stenson worked as a nursing assistant from 1990 until 2005; in 2005, Stenson stopped working and returned to school (Doc. No. 11-3, AR 30, 58; Doc. No. 11-8, AR 151). In May 2006, Stenson suffered a brain aneurysm that required surgery followed by a period of in-patient and out-patient rehabilitation (Doc. No. 11-11, AR 249).

In June 2006, Stenson applied for, and was later denied, DIB and SSI benefits, alleging she had been disabled since May 2006, due to ongoing mental and physical limitations suffered as a result of the brain aneurysm (Doc. No. 11-2, AR 9, 14; Doc. No. 11-5, AR 67–80 ). In June 2009, after an administrative hearing and review of the medical record, Administrative Law Judge ("ALJ") Teehan determined that Stenson was not disabled (Doc. No. 11-2, AR 11). Following the Appeals Council's denial of review, the ALJ's decision became the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of SSI and DIB benefits, this Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (citing 42 U.S.C. § 405(g)). Judicial review is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and

2

is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Even if a preponderance of the evidence, or indeed substantial evidence, supports a claimant's position, the court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). However, procedural errors can be a basis for overturning the decision of the Commissioner, even if that decision is supported by substantial evidence. *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

### DISABILITY DETERMINATION

Eligibility for DIB and SSI benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" under Social Security is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (definition used in DIB context); *see also* 20 C.F.R. § 416.905(a) (definition used in SSI context). In addition, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Walters*, 127 F.3d at 529 (citing 42 U.S.C. § 423(d)(2)).

3

The Commissioner's regulations governing the five-step evaluation of disability for DIB and SSI benefits are identical for the purposes of this Court's review, and are found at 20 C.F.R. §§ 404.1520 and 416.920, respectively:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  Determine the claimant's residual functional capacity and whether claimant can perform past relevant work.

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Only if a claimant satisfies each element of the analysis, including the inability to do other work, and meets the duration requirement, is she determined to be disabled.   20 C.F.R. § 416.920(4)(i)-(v); *see also Walters*, 127 F.3d at 529.

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five, in determining whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.*; *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The ALJ denied Stenson's request for benefits, finding that, while Plaintiff could not resume her past relevant work ("medium semiskilled"), Plaintiff has sufficient residual functional capacity to perform work at all exertional levels subject to certain limitations, including performing only simple, routine work limited to 3–4 step tasks, avoiding dangerous machinery and unprotected

4

heights, and involving only appropriate superficial interactions with the public (Doc. No. 11-2, AR 13, 20).

Stenson appealed the ALJ's decision, presenting three challenges to the ALJ's findings.  First, the ALJ failed to refer Plaintiff to a consultative examiner to reassess Plaintiff's IQ in light of the medical examiner ("ME"), Dr. Jonas' testimony that prior IQ evidence was ambiguous and unreliable (Doc. No. 13, at 2).  Second, the ALJ's assessment of her residual functional capacity ("RFC") is not supported by substantial evidence (*id.* at 9).  Third, the ALJ failed to abide by Social Security Administration regulations by failing to adequately explain the weight given to her medical sources' opinions (Doc. No 13, at 9–10).

Stenson's appeal was denied and she filed this lawsuit.  The R&R rejected all three arguments (Doc. No. 19, at 26) and recommended this Court affirm the ALJ.  In response, Stenson raises two objections to the R&R: (1) failure to order a consultative examination in order to fully and fairly develop the record on Stenson's mental residual capacity; and (2) Stenson was deprived of her procedural rights because no explanation was given regarding the weight ascribed to her treating doctors' opinions (Doc. No. 22, at 1).

### DISCUSSION

**Failure to Order Second Consultative Examination**

Stenson argues the ALJ and the Magistrate erred by failing to order a second consultative examination to correct an ambiguous or unreliable assessment of Stenson's IQ.  Stenson points to Dr. Jonas' testimony about the reliability of two IQ tests administered to Stenson in the months following her aneurysm (Doc. No. 22, 3–7).  One test, conducted in June 2006, approximately one month after her aneurysm, showed Stenson's intellectual functioning was low average, with a full scale IQ of 81,

5

a low average verbal IQ of 86, and a borderline nonverbal IQ of 79. Dr. Haines, who conducted the test, reported: "She does not appear to have experienced any decline in intellectual functioning" (Doc. No. 11-11, AR 251). A second test, conducted by Dr. Layne in October 2006 at the request of the Bureau of Disability Determination, showed a full scale IQ of 68 which is in the mildly retarded range, a verbal IQ of 70, and a performance IQ of 72. Dr. Layne noted the cognitive test scores were slightly low estimates because "[h]er history suggests no retardation, [h]er behavior today suggests no retardation or a brain injury, [and] [s]he was slightly unmotivated at today's testing," concluding that her intellect was "borderline" (Doc. No. 11-19, AR 364). Dr. Layne also gave Stenson a Global Assessment of Functioning ("GAF") score of 75, indicating very mild impairment in social, occupational, or school functioning (*id.* at 365).

The discrepancy in the two IQ tests was raised in the March 2009 hearing before the ALJ as an ambiguity that might impact the ALJ's disability determination. In response to the question of whether there was an ambiguity or insufficiency in the IQ testing as a valid measure of Stenson's functional capacity, the ME answered: "Yes, frankly I think it questions the validity . . ." (Doc. No. 11-3, AR 48). Based on this testimony that the discrepancy in IQ's scores was ambiguous, Stenson argues the ALJ and the R&R were incorrect in finding that an additional consultative examination was not needed.

While the ALJ is not obligated to provide consultative evaluations in all cases, 20 C.F.R. § 404.1512(f), Stenson argues the ambiguity in the IQ tests required another evaluation in order to develop a complete medical record before the ALJ could make a disability determination under steps three or five (Doc. No. 22, at 3). Specifically, Stenson argues another evaluation is needed to determine whether she is presumptively disabled under step three by having an impairment under

6

Listings 12.02 or 12.04 in the Listing of Impairments, independent of her mental RFC under steps four and five.  20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Stenson also argues the ALJ erred by failing to "discuss the listing by name and offer more than a perfunctory analysis of the listing."  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

The R&R recommends that another consultative examination is unnecessary, explaining (1) the ALJ did not abuse his discretion in denying a second consultative examination because he relied on the full medical record, not just the IQ tests, in making his disability determination; and (2) Stenson failed to explain how a second consultative examination for re-assessed IQ scores was necessary to make a disability determination (Doc. No. 19, at 19).  This Court agrees.

Stenson's argument that the ALJ failed to adequately explain his decision by making a "brief, two-sentence consideration of the Listing of Impairments" is incorrect (Doc. No. 22, at 7).  Quite the opposite -- the ALJ's opinion dedicates seven paragraphs to discussing his assessment of the Listing 12.02 criteria (Doc. No. 11-2, AR 12–13).  His discussion covers the Paragraphs B and C criteria and explains why those criteria were not met in context of the medical evidence (*id.*).  Furthermore, while the ALJ only explicitly analyzed Listing 12.02, the operative language in Listing 12.04, Paragraphs B and C, is identical to Listing 12.02, Paragraphs B and C, making the ALJ's findings that Stenson's mental impairment does not satisfy the requirements under either Paragraph just as applicable to Listing 12.04.  20 C.F.R. Pt. 404, Subpt. P, App. 1; *compare* Listing 12.02(B)(1–4) and (C)(1–3), *with* 12.04(B)(1–4) and (C)(1–3).  While he did not perform his own explicit Listing 12.04 analysis, the ALJ also credited the ME's testimony as supporting his decision (Doc. No. 11-2, AR 19).

Moreover, while Stenson correctly points out that the ALJ has a duty to fully and fairly develop the record in order to provide the claimant with a fair hearing, *Johnson v. Sec'y of Health*

7

*& Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986), the burden of proof remains on the claimant to show the disability prevents her from performing any substantial gainful employment. *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).  To this end, while Stenson argues the ambiguity in the different IQ test scores militates toward another consultative evaluation to fully develop the record, she fails to explain why or how another IQ test conducted by another consultative examiner would change the ALJ's determination in light of his consideration of the entire medical record.

The basis of Stenson's argument for another consultative review, the ME's testimony that Dr. Layne "really left open" the question about the reliability of the IQ test scores (Doc. No. 22, at 3–6), does not compel a different decision than that reached by the ALJ.  While the ME testified he had concerns that the validity of the two IQ tests was not addressed by Dr. Layne, a full review of the record does not indicate that the ambiguity is as great as portrayed by Dr. Jonas' testimony. Though Dr. Layne did not explicitly address the numeric discrepancies between his assessment and Dr. Haines' assessment, he stated that his results were low estimates based on his observations of Stenson during the examination -- a fact considered by the ALJ along with the evaluations of Drs. Haines and Layne in combination with Dr. Jonas' testimony (Doc. No. 11-2, AR 16–19).

Stenson also suggests that Dr. Layne's evaluation was not only ambiguous, but stale, having been conducted over two years before the ALJ hearing, and that a new evaluation was needed to show her current mental functional capacity.  This argument, however, cuts both ways.  While in some cases a two-year old examination may not reflect current disabilities, the ALJ was able to observe and question Stenson at the hearing, concluding that "the claimant's own testimony regarding her current functioning would suggest a higher level of functioning than was suggested by the IQ results at the consultative exam" (Doc. No. 11-2, AR 9).

Finally, Stenson fails to address the Mental Residual Functional Capacity Assessment ("MRFCA") completed by Dr. Finnerty in November 2006.  Section III of the MRFCA, which represents the actual mental residual functional capacity assessment for consideration by the ALJ (Program Operation Manual System ("POMS") DI 24510.060B2, 2001 WL 1933367), expressed no concerns with any discrepancies in the medical record (Doc. No. 11-19, AR 368–71).  After a review of the record, Dr. Finnerty concluded that some of Stenson's complaints about her conditions appeared to be exaggerated, that Stenson is minimally impaired in understanding and following instructions, and is able to relate to co-workers and perform simple, repetitive tasks (*id.* at 370).  In further support of his conclusions, Dr. Finnerty completed a Psychiatric Review Technique that indicates Stenson has a mild restriction in daily living activities, no difficulties in social functioning, and moderate difficulties in maintaining concentration (Doc. No. 11-19, AR 382).

In sum, the ALJ gave a well-supported explanation of his decision to not order another consultative examination.  He relied on the testimony of Dr. Jonas, the medical record, and the testimony of Stenson in making his determination (Doc. No. 11-2, AR 9).  Had the ALJ made his decision primarily or solely on the basis of the IQ tests, Stenson's argument for the necessity of another consultative evaluation might have merit.  That, however, it not what happened here.

### Failure to Explain Weight Attributed to Treating Sources

Stenson's second objection argues the Magistrate erred in her assessment of treating sources' medical opinions.  Stenson argues the "actual analysis" performed by the ALJ must be the basis for any decision to affirm or reverse the ALJ's decision, not *post hoc* rationale by the Magistrate (Doc. No. 22, at 8–12).

At issue are the opinions of seven doctors: Haines, Layne, Cremeans, Teeste, Mareska, Dull, and Gill. Stenson claims all seven were treating sources and, as "treating sources," the ALJ was required to "give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). As the Sixth Circuit has recognized, this is an important procedural rule to protect Social Security claimants. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

With respect to Drs. Haines and Layne, the ALJ used a significant amount of Dr. Haines observations and findings in his decision (Doc. No. 11-2, AR 15–16). While the ALJ may not have invoked any magic words that express the exact weight he gave to Dr. Haines' opinion, it is clear that the ALJ used most of Dr. Haines' opinions in conjunction with the ALJ's own observations of Stenson's testimony (*see, e.g.*, Doc. No. 11-2, AR 16).

With respect to Dr. Layne, the ALJ made specific statements about the portions of Dr. Layne's opinions that he did or did not rely upon (Doc. No. 11-2, AR 17, 19). The ALJ gave weight to Dr. Layne's opinions about Stenson's general physical and mental capabilities (Doc. No. 11-2, AR 17), but in light of Dr. Jonas' testimony, which the ALJ gave "significant weight," discounted Dr. Layne's IQ test data (Doc. No. 11-2, AR 19).

With respect to Dr. Cremeans, this Court agrees with the R&R that she was not an "acceptable medical source" and therefore the ALJ was not bound by the requirement to provide "good reasons" why he gave "little weight" to her opinion (Doc. No. 11-2, AR 17). "[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight." Social Security Ruling ("SSR") 06-03P, 2006 WL 2329939 at *2. Dr. Cremeans is a speech language pathologist (Doc. No. 11-18, AR 352). In her report, Dr. Cremeans opined on Stenson's

10

"short-term recall, attention and concentration and problem solving skills" (*id.*).  Under the regulations, a speech language pathologist is an "acceptable medical source . . . for purposes of establishing speech or language impairments only."  20 C.F.R. § 404.1513(a)(5); SSR 06-03P, 2006 WL 2329939 at *1.  Because her opinion did not address speech or language impairments, the ALJ was not required to treat the opinion as a treating source.

Dr. Teeste is also not an "acceptable medical source" under the regulations.  Dr. Teeste has advanced degrees in education and social work, along with a Professional Clinical Counselor license (Doc. No. 11-18, AR 360).  These credentials do not qualify her as an acceptable medical source under 20 C.F.R. § 404.1513(a) or SSR 06-03P.

While not naming Dr. Mareska, the ALJ discussed the doctor's opinions (Doc. No. 11-2, AR 14) set forth in Exhibits 3F and 13F (Doc. No. 11-10, AR 211–13; Doc. No. 11-19, AR 389–94).  The ALJ accurately reflected those opinions which showed no significant abnormalities and that Stenson's speech was slightly slow with some memory impairment (Doc. No. 11-10, AR 212).  These conclusions are consistent with other medical evidence in the record and consistent with the ALJ's residual functional capacity (Doc. No. 11-2, AR 13).  While the ALJ may not have stated the explicit weight he gave to Dr. Mareska's opinions, the ALJ's findings were consistent with the opinions and therefore not error.  *Wilson*, 378 F.3d at 547 ("[I]f the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant.").

Finally, with respect to Drs. Dull and Gill, this Court agrees with the R&R that, although the ALJ did not address the weight given to their opinions, this failure is irrelevant and therefore not

11

error.  *Wilson*, 378 F.3d at 547.  Dr. Dull's opinions from his post-operative treatment of Stenson support, not detract, from the ALJ's decision that Stenson is not disabled.  His opinions reflect that Stenson "continues to do well" in her recovery and only needed to return on an as-needed basis (Doc. No. 11-18, AR 350–51).  Similarly, the record contains a number of reports detailing Stenson's visits with Dr. Gill between 2007 and 2009 (Doc. No. 11-22, AR 464–94).  These reports contain a stream of observations that Stenson continued to take her medication, she was not in distress, was alert, oriented, cooperative, and did not appear to be suffering from acute psychological issues.  In short, these opinions, like Dr. Dull's, support the ALJ's decision.  As alluded to in the R&R, requiring a remand for the ALJ to memorialize these same observations in order to satisfy the strict interpretation of the regulations without adding anything to the substance or outcome of the proceeding "would be an idle and useless formality."  *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

## CONCLUSION

For the foregoing reasons, this Court determines that the ALJ based his decision on substantial evidence.  The Court adopts the Magistrate's recommendation to affirm the Commissioner's decision.

IT IS SO ORDERED.

___s/ Jack Zouhary___
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 29, 2010
